*479 JUSTICE LEAPHART
delivered the Opinion of the Court.
¶1 This is an appeal from the December 1, 1998 order of the Montana Thirteenth Judicial District Court, Big Horn County, on a Petition for Judicial Review, affirming the State Tax Appeal Board’s order assessing additional coal taxes against Decker Coal Company (Decker). We reverse the order of the District Court.

Procedural Background

¶2 The Department of Revenue of the State of Montana (DOR) conducted three separate audits and assessments of Decker for the years 1987 through 1992. On April 17,1992, DOR assessed additional taxes and interest against Decker for coal taxes for the years 1987 through 1988. Decker timely filed an objection to the assessment before the DOR Division Administrator. On April 14,1994, DOR assessed additional taxes and interest against Decker for coal taxes for the years 1989 through 1990. Both assessments were consolidated before the DOR Division Administrator. The DOR Division Administrator denied Decker’s appeal from the 1987-1990 tax assessments. Decker appealed that decision to the DOR Director. The Director denied the appeal. Decker then appealed the Director’s decision to the State Tax Appeal Board (STAB). Decker also filed an interlocutory appeal requesting the District Court to define “market value” and “arm’s length agreement.” On January 25,1996, Judge Baugh issued an order defining “market value,” for purposes of § 15-35-107(1) and (3), MCA, as the price a willing buyer would pay to a willing seller under the market and economic conditions at the time of the sale. Neither Decker nor DOR appealed from that decision.
¶3 On April 30,1996, DOR assessed additional taxes and interest for coal taxes for the years 1991-92. Decker appealed this assessment. That appeal was also denied. Decker then appealed the 1991-92 coal tax assessments to STAB. The appeals from the 1987-90 assessment and the 1991-92 assessment were consolidated. The parties filed cross-motions for summary judgment before STAB. STAB denied Decker’s motion for summary judgment and granted DOR’s motion. Decker filed a petition for judicial review of STAB’s decision. The District Court determined that STAB had hot included Findings of Fact and Conclusions of Law in the manner and form required and remanded to STAB for such findings and conclusions.
¶4 On September 15,1997, STAB issued Findings of Fact, Conclusions of Law, and an Order. Again concluding that STAB had failed to *480 include Findings of Fact and Conclusions of Law as required, the District Court remanded to STAB once more for appropriate Findings of Fact and Conclusions of Law. On February 6, 1998, STAB issued Findings of Fact and Conclusions of Law and an Order affirming DOR’s assessment of additional coal taxes against Decker. Decker petitioned for judicial review. On December 1,1998, Judge Watters entered an Order and Memorandum affirming STAB’s Third Order. Decker appeals from that decision.

Factual Background

¶5 The following are undisputed facts as set forth by the parties in their respective briefs. Decker owns and operates a coal mine in Montana (hereinafter referred to as the Decker mine). Decker, Black Butte Coal Company (Black Butte) and Big Horn Coal Company (Big Horn) all entered into contracts in the mid-1970s with Commonwealth Edison (ComEd) for the long-term delivery of coal. Under the terms of those contracts, each of these entities was to supply ComEd with coal at a base price that would be adjusted over time by a predetermined escalator. During the audit period of 1987-1992, the base price plus escalators on the Decker/ComEd contract computed to a price of roughly $24-$28 per ton.
¶6 Three contracts for the sale of coal are at issue in this appeal: (1) a contract entered into on December 31, 1986 between Decker (seller) and Big Horn (buyer) for the sale of coal by Decker during 1987; (2) a contract entered into on December 31, 1987 between Decker (seller) and Big Horn (buyer) for the sale of coal from 1988 through 1992; and (3) a contract entered into on January 1,1988 between Decker (seller) and Black Butte (buyer) for the sale of coal during the years 1988 through 1992 (collectively referenced herein as the Montana Contracts).
¶7 The price of coal sold by Decker to Big Horn and Black Butte for the relevant audit years 1987 through 1992 under the Montana Contracts ranged from approximately $7.50 per ton to $10.42 per ton. For the coal that Decker sold to Black Butte and Big Horn under the Montana Contracts, Decker timely reported and paid to the State of Montana $8.5 million in coal taxes on the full contract price.
¶8 The Montana Contracts followed from the decision of Black Butte and Big Horn, both Wyoming entities, to exercise their rights under separate coal purchase contracts, negotiated between themselves and ComEd in the 1970s (hereafter the Wyoming Contracts). *481 Black Butte and Big Horn apparently had the contractual right under the Wyoming Contracts to buy or “outsource” coal from an alternate source rather than mine the coal themselves. Exercising their right to outsource the coal, Black Butte and Big Horn contracted to purchase coal from Decker on the condition that ComEd contemporaneously purchase that coal from them. The coal purchased by Big Horn and Black Butte from Decker was shipped by Decker to ComEd to fulfill the contractual obligations of Big Horn and Black Butte under the Wyoming Contracts. Decker did not receive any additional money or other consideration of any nature from Big Horn or Black Butte for the coal when it was resold to ComEd under these separate Wyoming Contracts.
¶9 At the time of the Montana Contracts, Peter Kiewit Sons’, Inc. (Kiewit) directly or indirectly through its subsidiary Kiewit Mining Group (KMG), had ownership in Decker, Big Horn and Black Butte. Decker was a 50/50 Montana joint venture between KMG and Western Minerals, Inc., a wholly separate entity owned by Nerco, Inc. (NERCO). Black Butte was a 50/50 Wyoming joint venture between KMG and Bitter Creek Coal Company, a wholly separate entity owned by Union Pacific Corporation. Big Horn was a Wyoming Corporation and wholly owned subsidiary of Kiewit.
¶ 10 Negotiation of the Montana Contracts between Decker and Big Horn and Decker and Black Butte took place principally between Donald Sturm of Kiewit (on behalf of Big Horn and Black Butte) and Gerald Drummond of NERCO (on behalf of Decker).
¶11 A majority of Decker’s management committee, comprised of an equal number of persons designated by Kiewit and NERCO, must authorize sales of coal made by Decker. NERCO, Kiewit’s partner in Decker, was a competitor of Kiewit and knowledgeable about the coal market conditions from 1986 through 1988.
¶12 DOR has audited all major coal producers in the state of Montana from 1987 through 1990, but is unaware of any prices paid to Montana coal producers under coal contracts entered into from 1987 through 1990 that exceeded the approximately $7.50 to $10.42 per ton that Decker received from Big Horn and Black Butte under the Montana Contracts. The prices paid to other coal producers for contracts negotiated and entered between 1986 and 1989 ranged from $5.13 per ton to $8.70 per ton.
*482 ¶13 The following are comparable long term coal contracts that were negotiated and entered into during much the same time period as the Montana Contracts at issue:
[[Image here]]
¶ 14 DOR did not conduct a market value study nor did it determine the market value of coal for contracts entered into from 1986 through 1988. Rather, DOR imputed a price of roughly $24 to $28 per ton to the Montana Contracts based solely upon prices negotiated under a contract entered into on June 20, 1974 between Decker (seller), and ComEd (buyer), a Chicago, Illinois-based electric utility (hereafter the 1974 ComEd Contract). The coal prices under the 1974 ComEd Contract (as adjusted by predetermined escalators) for coal sold during the audit period were not intended to and did not follow market value prices.

Standard of Review

¶15 The parties do not dispute the Findings of Fact in STAB’s order of February 6,1998. Rather, they dispute the application of those facts to the law as set forth in § 15-35-107, MCA, and in Judge Baugh’s Interlocutory Order of January, 1996. Decker appeals from the District Court’s conclusion that STAB and DOR correctly interpreted the law in imputing market value to the coal contracts in question. Thus, resolution of this appeal involves questions of law that are to be reviewed for correctness rather than the clearly erroneous standard applicable to an agency’s finding of fact. See Steer, Inc. v. Dept. of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.

Issues Presented

¶16 Pursuant to § 15-35-107, MCA, DOR may impute a value to coal sales rather than relying on contract prices if (1) it determines *483 the contract price does not represent an arm’s-length agreement; and (2) the imputed value approximates market value. Thus, the questions presented for this appeal are:
¶17 1. Whether Decker has an arm’s-length relationship with Wyoming coal producers, Big Horn and Black Butte?
¶18 2. Whether the $24-$28 per ton value that DOR imputed to the contracts approximates market value?
¶19 Since we determine that resolution of issue number two is dispositive, we do not address issue number one.

Introduction

¶20 Section 15-35-107, MCA, provides as follows:
When value of coal may be imputed — procedure. (1) The department may or shall at the request of the taxpayer impute a value to the coal which approximates market value f.o.b. mine in a case where:
(c) a person sells coal under a contract which is not an arm’s-length agreement[.]
¶21 In order to impute a value to coal sales under § 15-35-107(l)(c), MCA, DOR must meet a two-part standard: it must determine that the contract price does not represent an arm’s-length agreement and that the transaction is less than market value. The two criteria are stated in the conjunctive. Thus, if DOR fails to satisfy either standard, DOR may not impute a value to the coal sales in question. Since we determine that Decker has shown that DOR’s imputed value does not “approximate” market value under the market and economic conditions pertaining in 1986-1988, we need not address the question of whether the sales were arm’s-length.
¶22 In his interlocutory order, Judge Baugh defined “market value” as follows:
The term “market value” as set forth in Sec. 15-35-107(1) and (3), M.C.A., means the price that a willing buyer would pay to a willing seller under the market and economic conditions at the time of sale.

Department of Revenue’s Contentions:

¶23 DOR contends that there was no need to conduct a market value study; rather, the best indicators of value for the coal at issue are the actual sales of coal mined by Decker in the 1980s and sold to ComEd pursuant to the 1974 contract between ComEd and Decker. The record contains examples of such sales that occurred between Decker *484 and ComEd, Black Butte and ComEd, and Big Horn and ComEd at prices between roughly $24 and $28 per ton.
¶24 DOR argues that in imputing value, § 15-35-107(3), MCA, allows DOR to apply factors used by the federal government under 26 U.S.C. § 613 and 26 C.F.R. § 1.613-41, including the taxpayer’s sales of ores or minerals of like kind and grade. DOR may also consider any other additional criteria it considers appropriate.
¶25 DOR contends that, when applying the factors from the above IRS regulation, the representative market price is established by the coal sold to ComEd under the 1974 ComEd Contract. The assessments of Decker were appropriately based upon that 1974 arm’s-length contract.
¶26 In summary, DOR contends that this appeal involves Decker coal that is mined at Decker, loaded on the train at Decker, shipped directly to ComEd, and never touched by Black Butte or Big Horn. As characterized by DOR, when the coal comes down the conveyor belt at the Decker mine, it is purchased by Big Horn and Black Butte and resold to ComEd before it hits the railroad car. DOR posits that Decker cannot use this “paper sham” transaction to contract away its tax obligation on coal that is mined in the state of Montana.
Decker’s Contentions:
¶27 Decker contends that DOR’s imputed price of $24-$28 per ton, based upon the 1974 ComEd Contract, has no reasonable relationship to the undisputed market price of coal during the period when the Montana Contracts were negotiated. The 1974 ComEd Contract was negotiated over a decade earlier under very different market and economic conditions. Decker produced and sold all of the coal it was allowed to sell to ComEd under the 1974 contract and paid the State of Montana all coal taxes due based on these prices. Decker argues that DOR made no attempt to support its position with evidence that there were any contracts negotiated under the “market and economic” conditions existing in 1986-1988 at prices higher than what Decker received under the Montana Contracts. Absent Decker’s sales of coal to Big Horn and Black Butte under the Montana Contracts, the coal in question would have been sold in the same market at the same or lower prices to another consumer, or perhaps it would have remained in the ground for lack of another buyer.
¶28 Decker argues that STAB failed to make any factual findings to support DOR’s imputed price of $24-$28 per ton as “market value” under the legal standard established by Judge Baugh. To the contrary, *485 Decker asserts it had no opportunity, during the period in question, to sell this coal for the $24-$28 per ton prices that DOR has imputed.
The District Court’s Conclusions:
¶29 After determining that substantial evidence supported DOR’s decision that the transactions were not arm’s-length, the District Court concluded that
The only market for Decker’s coal was Commonwealth Edison. Commonwealth Edison was the only relevant market because the “Wyoming Contracts” sales were contingent upon the contemporaneous sale of Decker’s coal to Commonwealth Edison. The contracts did not permit either Black Butte or Big Horn to sell coal to anyone other than Commonwealth Edison. This closed market (Commonwealth Edison) was the market condition at the time of sale.... Therefore, the market value of coal was approximately $24-$27 a ton, the price of the coal under the Commonwealth Edison contracts. [Citations omitted.]

Discussion

130 Under § 15-35-107, MCA, DOR may impute a value to coal sales rather than rely on contract prices if: (1) it determines the contract price does not represent an arm’s-length agreement, and (2) the imputed value approximates market value. Judge Baugh, in his interlocutory order, defined market value as: “The term ‘market value’ as set forth in Sec. 15-35-107(1) and (3), M.C.A., means the price that a willing buyer would pay to a willing seller under the market and economic conditions at the time of the sale.” This definition, which is not disputed, by its terms requires a determination of what a willing buyer would pay to a willing seller under a contract negotiated under the market and economic conditions prevailing as of 1986-1988.
¶31 The only evidence presented as to what a willing buyer would pay to a willing seller pursuant to a contract negotiated in 1986-1988 was in the Sansom Report prepared by Decker’s expert, Dr. Robert L. Sansom. The Sansom Report documents transactions and bids for coal comparable in quality and in time to the Montana Contracts. The Sansom Report shows that coal sales in Decker’s market area, which reflected the market and economic conditions prevailing at the time of the sale, ranged from $3.77 to $7.61 per ton. The Sansom Report took into account both short term (spot market) contracts and long term contracts negotiated in the same time frame as Decker’s 1986-1988 contracts with Big Horn and Black Butte. Although DOR did not agree with Dr. Sansom’s conclusion that the *486 Montana Contracts were at market value, it does not disagree with any of the data or other factual recitations contained in the report as to what coal was selling for from 1986 to 1988. Further, DOR did not present any evidence that coal contracts were entered into from 1986 to 1988 at prices that differed from those enumerated in the Sansom Report. The coal prices ($7.50 to $10.42 per ton) under the Decker/Black Butte and Decker/Big Horn contracts were equal to or greater than the coal prices set forth in the Sansom Report ($3.77 to $7.61 per ton). There being no evidence to the contrary, we conclude that the prices paid to Decker by Black Butte and Big Horn under the Montana Contracts met or exceeded market value, in other words, the price that a willing buyer would pay to a willing seller under market and economic conditions at the time of the sale.
¶32 The District Court concluded that the only relevant market was ComEd. However, the agreed upon definition of “market value” does not distinguish between an open and a closed market. Rather, the plain language of the definition refers to the price that a willing buyer would pay to a willing seller under the market and economic conditions at the time of the sale. We conclude that market value is established by the Sansom Report’s undisputed documentation of coal sales from 1986 to 1988. Secondly, the fact that the parties made the sale of coal under the “Montana Contracts” contingent upon the contemporaneous sale of the coal to ComEd does not change the fact (shown by the Sansom Report) that there was a market for the sale of coal to buyers other than Black Butte or Big Horn. This was not a “closed market” situation where the customers (Black Butte and Big Horn) could not turn elsewhere to purchase or outsource the coal. Compare Palmer v. Columbia Gas of Ohio, Inc. (6th Cir. 1973), 479 F.2d 153, 163 (recognizing “closed market[s] where the customer cannot turn elsewhere to purchase the services or products offered”). The fact that ComEd was bound to purchase coal from Black Butte and Big Horn was attributable to ComEd’s 1974 contracts, not to the 1980s Montana Contracts. We conclude that the District Court erred in concluding that ComEd’s 1974 contracts defined the relevant market for the purpose of determining market value with regard to the Montana Contracts. ComEd’s obligations under the 1974 contracts do not define “market and economic conditions at the time of sale” for willing buyers and sellers of coal in Montana during the 1980s.
¶33 Moreover, the $24-$28 per ton price imputed by DOR ignores the temporal component of the market value definition. DOR’s im *487 puted price is erroneously pegged to the 1974 ComEd contracts rather than to any market factors extant “at the time of the sale.” The fallacy of DOR’s position is apparent from the expert report submitted by DOR’s expert, Dr. Ronald Johnson, whose report was not a market value study but rather an overview of long-term coal contracting. Dr. Johnson recognized that the market and economic conditions existing when the 1974 ComEd Contract was negotiated differed from the market and economic conditions between 1986 and 1988 when the Montana Contracts were negotiated. He also recognized that the coal prices that Decker received from ComEd from 1986 to 1988 were based upon price escalators pre-determined back in 1974 and that those escalators “did not do a very good job of tracking new contract prices of the mid and late 1980s” and “were not design[ed] to closely follow changes in the market price for coal, however defined.”
¶34 Dr. Johnson’s observations are borne out by the Stagg Report, which was commissioned by the State of Montana’s Department of Commerce. Stagg Engineering was retained by the Department of Commerce to conduct a study and assessment of the future market demand for Montana coal production and related topics. The results of the study were published in January, 1996 for the Montana Department of Commerce and the Office of the Governor, Economic Development Office. The report provides, in part:
The Decker mine is facing several critical issues related to sales to both Detroit Edison and Commonwealth Edison. ... Of much greater economic importance to Decker profitability and future State tax revenues, however, are the prices embodied in the long-term contracts for both utilities. The Consultant’s analysis, as well as abundant anecdotal evidence and observations by utility industry analysts, indicate that the current contract prices are significantly above market, by a factor of 50% in the case of Detroit Edison and as much as 300% for Commonwealth Edison.
¶35 The 1996 Stagg Report does not specifically reference the 1986-1988 time frame at issue here. Nonetheless, it graphically illustrates the fact that contract prices based upon pre-determined escalators, which were negotiated years ago in long-term contracts, do not accurately reflect present-day market value.
¶36 As Decker points out, the illogic of DOR’s position is further illustrated by reversing the price differential between the 1970s and 1980s contracts at issue. Had coal prices increased from the 1970s *488 time period instead of decreasing, the coal prices under the 1980s contracts would exceed the prices from the 1970s contracts. Under DOR’s rationale, DOR would ignore the higher negotiated market price in the 1980s and assess taxes based upon the lower prices negotiated in the 1970s. This would unfairly and illogically deprive the State of tax revenue by freezing tax assessments at 1970s levels. When coal prices decrease, as they did in the 1980s, it is equally illogical to assess the 1980s production of coal at the higher 1970s prices. Both logic and law dictate that the assessment be based upon market value at the time of the sale.
¶37 We find unpersuasive DOR’s arguments that Decker’s 1974 contract with ComEd should determine the market value of coal sold under the Montana Contracts. DOR contends that the 1974 ComEd Contract is relevant to the determination of market value for the Montana Contracts because the price of coal under that contract could not be determined until the coal was actually sold by Decker in the 1980s. That is, the price at which coal is sold under the long-term contracts is determined at or near the time of sale. This is true. However, this contention ignores the fact that the price paid for coal in the 1980s pursuant to long-term contracts is determined, not by reference to market and economic conditions extant in the 1980s, but by reference to escalators pre-determined in the 1970s that were not designed to track current market value. DOR’s contention that the 1970s long-term contract prices, when implemented in the 1980s according to predetermined escalators, are “at the time of sale,” is untenable.
¶38 DOR further argues that its reliance upon the 1974 ComEd Contract is compelled because that contract establishes the price for the same coal being shipped to ComEd on the same train as the Decker/Big Horn and Decker/Black Butte coal in dispute. Thus, posits DOR, it was comparing “apples to apples.” This argument ignores the fact that coal, like apples, can be an interchangeable commodity in the sense that one train load may contain a sufficient quantity of coal to satisfy numerous contracts entered into at different times and for different prices. Decker did not use the coal mined pursuant to the Black Butte and Big Horn contracts to satisfy Decker’s 1974 contract obligation to ComEd. As Decker points out, the Black Butte and Big Horn coal, although transported on the same train as the Decker/ComEd coal, was “new coal.” That is, Decker had already satisfied its contract with ComEd. The Black Butte and Big Horn con *489 tracts thus represent coal that Decker was mining above and beyond any coal that Decker needed to satisfy its ComEd contract. The fact that it was the “same coal” in terms of quality and source does not mean that it was the same coal that was being shipped to satisfy the 1974 ComEd Contract, nor does it mean that Decker was somehow precluded from negotiating new sales of that coal at different prices reflecting the market and economic conditions “at the time of the sale.”
¶39 In support of its reliance on the 1974 ComEd Contract, DOR invokes § 15-35-107(3), MCA, which states:
(3) When imputing value, the department may apply the factors used by the federal government under 26 U.S.C. 613, or that provision as it'may be labeled or amended, in determining gross income from mining or the department may apply any other or additional criteria it considers appropriate.
¶40 In turn, the federal regulation interpreting 26 U.S.C. § 613 provides as follows:
Sales or purchases, including the taxpayer’s, of ores or minerals of like kind and grade as the taxpayer’s, will be taken into consideration in determining the representative market or field price for the taxpayer’s ore or mineral only if those sales or purchases are the result of competitive transactions.
26 C.F.R. § 1.613-4(c)(3) (1972).
¶41 Thus, DOR contends, it had leeway to consider Decker’s “own actual sales prices for ores or minerals of like kind and grade.” Although the above regulation clearly allows consideration of the taxpayer’s own sales of ores of like kind and grade, it does not suggest that the taxpayer’s own actual sales, regardless of date and price, shall be determinative of current market value. Rather, the regulation is couched in terms of ascertaining a “representative” market. For purposes of resolving the issue under consideration, a “representative” market is one that reflects market value “at the time of the sale.”
¶42 Decker’s sale of coal to ComEd pursuant to a 1974 contract with pre-determined escalators is not representative of the market and economic conditions at the time of the sale and thus does not meet the controlling definition of market value.
¶43 DOR and STAB’s conclusion that the 1974 ComEd Contract price represents the price that a willing buyer would pay to a willing seller under the market and economic conditions at the time of the *490 1980s sales is incorrect. We conclude that Decker has shown that DOR’s imputed value of $24-$28 per ton does not “approximate[ ] market value f.o.b. mine,” § 15-35-107(1), MCA, under the market and economic conditions pertaining in 1986-1988.
¶44 The decision of the District Court, affirming STAB, is reversed and DOR’s assessment based upon the imputed value of $24-$28 per ton is hereby dismissed.
CHIEF JUSTICE TURNAGE, JUSTICES NELSON, GRAY and REGNIER concur.