DA 14-0057

FILED

January 13 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0057

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2015 MT 10

CLOUD PEAK ENERGY RESOURCES, LLC,

        Plaintiff, Appellee and Cross-Appellant,

    v.

STATE OF MONTANA,
DEPARTMENT OF REVENUE,

        Defendant, Appellant and Cross-Appellee.

| | |
|---|---|
| APPEAL FROM: | District Court of the First Judicial District,<br>In and For the County of Lewis and Clark, Cause No. BDV2012-239<br>Honorable Jeffrey M. Sherlock, Presiding Judge |

COUNSEL OF RECORD:

        For Appellant:

                Brendan R. Beatty (argued); Courtney Jenkins, Special Assistant
                Attorneys General; Helena, Montana

        For Appellee:

                Kyle A. Gray (argued); Robert L. Sterup, Jr., Holland & Hart LLP;
                Billings, Montana

                                  Argued: November 25, 2014
                                    Submitted: November 25, 2014
                                    Decided: January 13, 2015

Filed:

                        _____
                                     Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 The State of Montana, Department of Revenue (Department) appeals from the portion of the judgment entered by the First Judicial District Court, Lewis & Clark County, holding that the market value of coal sold under non-arm's length agreements is determined by comparing its price with that of coal sold under arm's length contracts negotiated in a similar timeframe. Cloud Peak Energy Resources, LLC (Cloud Peak), cross-appeals from the portion of the judgment holding that coal additives used from 2005-2007 are subject to Montana Coal Taxes. We affirm in part and reverse in part, restating the issues on appeal as follows:

*1. Did the District Court err by holding that the Department incorrectly imputed revenue from non-arm's length coal sales under § 15-35-107, MCA?*

*2. Did the District Court err by holding that coal additives used from 2005-2007 are subject to Montana Coal Taxes under § 15-35-102(7), MCA?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Cloud Peak owns and operates the Spring Creek coal mines in Big Horn County, Montana. In July 2008 the Department initiated an audit of Cloud Peak's Montana Coal Tax payments for years 2005-2007. In March of 2012, the Department issued a "Final Division Determination" in which it levied a deficiency assessment for additional taxes owing from sales involving non-arm's length (NAL) agreements. The deficiency assessment was specifically concerned with NAL contracts Cloud Peak had entered into with its affiliates, Venture Fuels and Northern Coal Transportation Company. Because coal is often sold at prices below market value in NAL agreements, the Department is

2

authorized by § 15-35-107, MCA, to impute value to the coal for purposes of calculating the revenue the seller would have received had it sold to an arm's length buyer and assessing taxes thereon. The statute requires the imputed value to be based on the fair market value of the coal.

¶3 Federal law also imputes income for sales made under NAL agreements. 30 C.F.R. 1206.257. Previously, a predecessor to Cloud Peak and the Federal Mines Management Service entered into a settlement agreement setting forth a method to determine market value for its NAL coal sales for purposes of federal taxation.[1] In the March 2012 assessment, the Department used the federal methodology to calculate market values for the coal. Cloud Peak objected to the Department's utilization of the federal methodology as a means of approximation, arguing it failed to contemplate Montana law and was appropriate only with respect to Federal royalty liabilities. Cloud Peak filed a declaratory judgment action, seeking a ruling that the Department had erred by employing the methodology used in the federal settlement. In response, the Department withdrew the original assessment and the methodology under the federal settlement, but employed a similar methodology in a June 2012 revised assessment, imputing a market value for the NAL contracts by comparing them to arm's length prices of coal mined and shipped from the same mine during the same time period as the NAL

---

[1] Under the settlement agreement, Cloud Peak compares each NAL sale to monthly average arm's length mine prices. If the NAL sale has a lower price than the average arm's length price, revenue is imputed up to the average. If the NAL sale has a higher price than the monthly average, no downward adjustments are made. The agreement provided that it would "have no precedential value and shall not be binding on either party as to any [other] issues."

coal was shipped. The revised assessment imposed $3,369,713 in additional taxes and penalties.

¶4 Upon receiving the revised assessment, Cloud Peak amended its complaint for declaratory relief, alleging that the Department's methodology for determining market value was illegal, and that it had also illegally assessed taxes on coal additives for years 2005-2007. In August 2013, the parties moved for summary judgment and, on October 31, 2013, the District Court issued its Order on Cross-Motions for Summary Judgment, holding in Cloud Peak's favor on the imputation issue and reasoning as follows:

> The price is not determined when the coal is loaded onto the train. Rather, the price is determined by the contract that, in most instances, is negotiated some time earlier. That negotiation sets the price and should be considered the date that sets the market value of that coal that is later loaded onto a train. No calculations other than tonnage appears [sic] to be done when the coal is put into the train. Rather, the price is determined pursuant to a contract that was earlier entered. Thus, in order to get the true market value of this coal, the proper comparison is with contracts negotiated in a similar time frame as the NAL contracts.

The District Court also stated that "the best way to determine market value would be to compare arm's lengths contracts negotiated a few months before and a few months after negotiation of NAL contracts here at issue," which it also described as a "contemporaneous" comparison. It concluded that, "except as noted above, the Department's methodology is appropriate." The court ruled in the Department's favor on the issue regarding additives. Both parties appeal.

4

## STANDARD OF REVIEW

¶5      A district court's interpretation and application of a statute is a conclusion of law. *Ritchie v. Town of Ennis*, 2004 MT 43, ¶ 33, 320 Mont. 94, 86 P.3d 11.   This Court reviews a district court's conclusions of law to determine whether those conclusions are correct.   *Mont. Petroleum Tank Release Comp. Bd. v. Crumleys*, 2008 MT 2, ¶ 32, 341 Mont. 33, 174 P.3d 948.

## DISCUSSION

¶6      *1. Did the District Court err by holding that the Department incorrectly imputed revenue from non-arm's length coal sales under § 15-35-107, MCA?*

¶7      Section 15-35-107(1)(b), MCA, provides that the Department of Revenue may impute a value for coal sold under NAL agreements that approximates its "market value f.o.b. mine."   The dispute here is over what time period should be used as a source of comparable sales to determine the "market value f.o.b. mine" for NAL sales.   The Department asserts that market value for NAL sales should be calculated by comparing the average price of coal sold under arm's length agreements that was shipped at the same time the NAL coal was shipped.   Conversely, Cloud Peak contends that, to satisfy the statute, the market value for NAL sales should be determined by looking to the average price of coal sold under arm's length contracts negotiated in the same time period as the NAL contracts were negotiated.

¶8      Both parties cite our decision in *Decker Coal Co. v. Dep't of Revenue*, 2000 MT 125, 299 Mont. 447, 2 P.3d 245, in support of their respective positions.   There, the Department's assessment of additional taxes and interest for previous years led to a

5

dispute over the methodology used by the Department to approximate market value under § 15-35-107, MCA. *Decker*, ¶ 15. The Department had calculated the market value of coal sold under the subject contracts by comparing them to sales made under a long-term contract negotiated 14 to 18 years earlier and premised upon a pre-determined escalator. *Decker*, ¶¶ 5-6. In invalidating the Department's assessment, we reasoned that the long term contract was a poor indicator of market value because the price paid for coal under the subject contracts was determined, "not by reference to market and economic conditions extant in the 1980s, but by reference to escalators pre-determined in the 1970s that were not designed to track current value." *Decker*, ¶ 37. We defined "market value" several times to be "the price that a willing buyer would pay to a willing seller under market and economic conditions *at the time of sale.*" *Decker*, ¶ 31 (emphasis in original); *see also* ¶¶ 32, 37.

¶9 The parties argue over the meaning of the phrase "time of sale" that we used in *Decker*, which the Department argues occurs at the time of severance and shipment. It notes the tax at issue is a severance tax that does not attach until the coal is extracted and prepared for shipment. Thus, it argues the market values for the subject NAL sales were properly calculated by comparison to prices paid for Cloud Peak arm's length sales of similar volumes of similar quality coal shipped from the same mine during the same time period. Cloud Peak responds that the Department has conflated "shipment" with "sale," and instead offers that the dates the coal contracts were actually entered is the "time of sale." While acknowledging the Department's position that small adjustments in prices

6

sometimes occur following contract negotiation, Cloud Peak notes that the base price for coal is fixed at the time of contract execution and remains in effect throughout the life of the contract. Cloud Peak thus argues that, for purposes of imputing actual market value, the "time of sale" can only be when the contract is negotiated, and thus, arm's length contracts negotiated within a similar time frame as the subject NAL contracts must be used for comparison. Cloud Peak further notes that, while the severance tax attaches at the time coal is severed, that is not the time when market forces have set the value of that coal.

¶10 The District Court used examples to illustrate the differences in these methodologies. In September 2006, Cloud Peak shipped coal to its affiliate, Venture Fuels, under a NAL contract that sold the coal at $6.75/ton. The Department compared that price to two sales under arm's length contracts that had shipped at the same time, concluding the market value of the subject NAL contract was $16.30/ton. However, the NAL price of $6.75/ton was negotiated in a contract that had been entered in January 2005, 21 months before the coal was shipped. A comparison with arm's length contracts for coal that were negotiated in January 2005, the same time the subject NAL contract was negotiated, yields an average sales price of $8.87/ton. This example highlights the problematic nature of the differing methodologies, as one imputed value is nearly twice that of the other.

¶11 Although we rejected the price set by actual negotiation in *Decker*, we did so because the negotiated price no longer accurately reflected "market and economic

7

conditions" and therefore, the statutory requirement of "market value f.o.b. mine" was not satisfied. *Decker*, ¶ 37. As demonstrated, the coal market is prone to fluctuations, and those fluctuations are often drastic. As such, comparing prices between NAL sales and arm's length sales simply because they are shipped at the same time does not reflect market value when the prices paid are actually based on negotiations at different times and under different economic conditions. The Department's approach is not an "apples to apples" comparison. *Decker*, ¶ 38. Section 15-35-107, MCA, directs the Department to impute value based on market value, which can only be approximated by taking into account the economic forces in play at the time the basic price was set. The District Court correctly reasoned that, in this case, "[t]he price is not determined when the coal is loaded onto the train. Rather, the price is determined by the contract that, in most instances, is negotiated some time earlier."

¶12 The District Court's comment that contracts reflecting market value are negotiated earlier "in most instances" also bears mentioning. Although we are holding on this record that the contract price of Cloud Peak's arm's length contracts negotiated during the similar time period provides a proper market value basis to satisfy the statute, this measure may not always be a proper one. As noted, the record in *Decker* was such that we concluded that the negotiated contract price did not reflect market and economic conditions necessary to properly measure market value. Another case may likewise require a different measure to satisfy the statute.

8

¶13 The District Court's order included additional language that directed the Department to use comparable sales "a few months before and a few months after" the subject contracts were executed, or to use some other "contemporaneous" measure. Although it was hesitant about directing the Department too specifically, the court nonetheless imposed sidebars on the Department's discretion that we conclude were inappropriate. Section 15-35-107(3), MCA, provides that the Department may, when imputing value, apply the factors used by the federal government or "any other or additional criteria it considers appropriate" in determining the market value of the subject contracts, and the court's statements potentially impinged upon the Department's statutory discretion. While the Department may choose to utilize these criteria when fashioning a method of determining market value, it is beyond the judicial duty to require it. Thus, while affirming the District Court's holding that market value is here properly based upon similarly negotiated contracts, we reverse its additional statements beyond this holding.

¶14 *2. Did the District Court err by holding that coal additives used from 2005-2007 are subject to Montana Coal Taxes under § 15-35-102(7), MCA?*

¶15 Section 15-35-102(5), MCA, defines "contract sales price" as "either the price of coal extracted and prepared for shipment f.o.b. mine . . . or a price imputed by the department under [§ 15-35-107, MCA]." Section 15-35-102(7), MCA, further defines "prepared for shipment" to "include[] . . . services such as in-mine movement, crushing, sizing, screening, storing, mixing, loading, treatment with substances including chemicals or oils, and other preparation of the coal for disposition." The Department's March 2012

9

Assessment sought recovery of taxes on two additives: freeze proofing agents and dust suppressants.[2] That assessment was subsequently carried forward into the June 2012 Assessment at issue here.

¶16 The parties argue over § 15-35-102(7), MCA, the portion of the statute defining "prepared for shipment," which was added by a 2009 legislative revision. As enacted, the amendment was made applicable to coal mined after June 30, 2009. Section 3, Ch. 43, L. 2009. Cloud Peak thus argues that the Department's imposition of these taxes for 2005-2007 was improper because the amendment was not made retroactive. The Department asserts the amendment was merely a clarification to an existing law and that it had authority to levy the tax even prior to the amendment.

¶17 In holding for the Department, the District Court relied, in part, on the legislative history of the act, noting that one legislator commented that the amendment simply "clarifie[d] current practice that other costs prior to 'prepared for shipment' or 'f.o.b. mine' are part of the coals' value and cannot be deducted." H.R. Comm. on Taxation, *Amendments for SB509*, 2009 Reg. Sess., 1 (Apr. 6, 2009). The District Court granted summary judgment to the Department, citing both the plain language of the statute and the legislative history:

> [C]ontract sales price means "the price of coal extracted and prepared for shipment f.o.b. mine." Preparing coal for shipment is whatever occurs prior to the train pulling away from the loading platform. Here, that would include the side-release chemicals and dust suppressant. This is consistent with the legislative history comment set forth above that indicates that

---

[2] The freeze proofing agent is sprayed on the inside of rail cars to prevent the coal from freezing to the side and dust suppressants are applied to the coal while it is being loaded for shipment.

10

current practice, prior to the insertion of the language in Montana Code Annotated § 15-35-102(7), was that such other costs are part of the coal's value.

¶18 We likewise agree with the Department that the 2009 amendment creating § 15-35-102(7), MCA, simply added a more explicit definition of "prepared for shipment." Prior to the amendment, the plain language of the statute was already broad enough to authorize the Department to assess taxes based upon the costs associated with preparation of coal for shipment. By adding the language of -102(7), MCA, the Legislature simply provided further explanation of what is encompassed within the term "contract sales price." We affirm the District Court's holding that the Department's levying of taxes for the additives used prior to the amendment was proper.

¶19 Affirmed in part and reversed in part.


/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT